```
                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MARYLAND

JASON GEIB,                      :

      Plaintiff,                 :

v.                               :     Civil Action No. GLR-13-2674

PERFORMANCE FOOD GROUP, INC.,    :

      Defendant.                 :
```

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant's, Performance Food Group, Inc. ("PFG"), Motion for Summary Judgment (ECF No. 28) and Plaintiff's, Jason Geib, Motion to Strike Certain Paragraphs of PFG's Affidavits (ECF No. 39). The Motions are ripe for disposition. Having reviewed the Motions and supporting documents, the Court finds no hearing necessary pursuant to Local Rule 105.6 (D.Md. 2016). For the reasons outlined below, the Court will deny PFG's Motion for Summary Judgment and grant Geib's Motion to Strike in part and deny it in part.

## I.   BACKGROUND[1]

PFG is a foodservice distributor that delivers products to restaurants, schools, and other institutions. PFG employed Geib as warehouse manager at its Carroll County facility ("CCF") in

---

[1] Unless otherwise noted, the following facts are taken from the parties' briefings on the instant motions, and are viewed in the light most favorable to the nonmoving party.

New Windsor, Maryland from September 25, 2006 to March 19, 2007. Geib was hired to improve warehouse operations, particularly during the night-shift, which had declined substantially since spring of 2006 due to understaffing and an increase in the volume of produce.  As warehouse manager, Geib was responsible for supervising, hiring, and training warehouse staff.

At the time Geib was hired, he reported directly to Carl Bredberg, Vice President of Operations at CCF, until Bredberg's departure in January 2007.  Dave Russ, Regional Vice President of Operations, supervised CCF until Jeffrey Wismans, selected to be Bredberg's replacement, began working on February 4, 2007. As Geib's interim supervisor, Russ sent Geib several emails from January 11, 2007 to February 10, 2007, informing him of his failure to complete timely reports, properly train and supervise warehouse staff, meet productivity expectations, communicate effectively, and conduct observations of associates to ensure they followed best practices within the warehouse.[2]

During Geib's tenure, he hired several female employees. On November 9, 2006, Julie Lawrence received an offer to work for PFG as a food selector.  In November 2006, Russ and Dan Pekscamp, Corporate Senior Vice President of Operations, told

---

[2] Russ and Kyle Gardner, the night warehouse supervisor at CCF, testified that conducting observations was an important method of improving productivity in warehouses.  (Russ Dep. at 52, ECF No. 31-28; Gardner Dep. at 277-78, ECF No. 31-26).

Geib to remove female employees from the warehouse. Geib, however, trained Lawrence and came to believe that she would be a good candidate for a supervisory position. In January 2007, Geib spoke to Russ about Julie Lawrence being a potential candidate for a supervisor position. Russ responded that Pekscamp would not approve of Lawrence becoming a supervisor because Pekscamp did not want women in the warehouse. Also in January 2007, Pekscamp told a night shift manager to fire a female employee and stated that Geib needed to stop hiring women.

On February 7, 2006, Wismans emailed Steve Stacharowski, Vice President of Human Resources for PFG, stating he wanted to post a position for a night-shift selection trainer/supervisor. The position was posted on a recruitment website on February 13, 2007, and the last date to apply was February 21, 2007. It is disputed when Geib told Lawrence about the position and asked her to apply. Lawrence faxed her resume and letter of interest regarding the position to Geib on February 28, 2007.

In late February 2007, Geib noticed who he believed to be external applicants being interviewed for the supervisory position. Geib went to Stacharowski's office to follow-up on Lawrence's application. PFG's policy required associates to have at least six months of service, or obtain the approval of the president or a general manager of PFG, before they could

apply for a supervisor position. Because Lawrence had not worked for PFG for the requisite six months, Geib asked Stacharowski to exempt her from the requirement. When Stacharowski would not exempt Lawrence from the requirement, Geib complained that Lawrence was not being considered because she is a woman. Geib also complained to Russ about Lawrence's application not being considered because she is a woman. Both Russ and Stacharowski dispute that these conversations ever took place. (Stacharowski Decl. ¶¶ 32–33, ECF No. 34; Russ Decl. ¶¶ 30–32, ECF No. 33).

Due to the lack of performance improvements within the warehouse, Russ sent an email to J. Michael Mattingly, President of PFG, on February 26, 2007 stating he would make recommendations regarding changes in the warehouse management structure. At an unspecified time, Mattingly subsequently learned that the recommendation was to replace Geib. (Mattingly Decl. ¶ 26, ECF No. 32).

On March 3, 2007, Geib emailed Wismans and Stacharowski, stating that his wife was injured in a car accident and he needed to travel to Oklahoma to take care of his children. On March 5, 2007, Wismans sent an email to Stacharowski about Geib's lack of commitment to his job and their need to start a confidential search for an experienced warehouse manager to replace Geib. At some point between March 5 and March 16, 2007,

Gardner told Geib that his position was posted online.  On March 14, 2007, Geib emailed Stacharowski and Wismans stating that he was hoping to return to work around March 26, 2007.  In response to Geib's email, on March 14, 2007, Stacharowski requested that Geib contact him or Wismans prior to making plans to return because there were "some things [they needed] to discuss."  (ECF No. 31-21).  Stacharowski states they needed to discuss the decision he, Mattingly, and Wismans made to terminate Geib's employment.  (Stacharowski Decl. ¶ 24, ECF No. 34).

On March 16, 2007, Geib called Stacharowski to discuss PFG posting his position online and whether PFG would offer him financial assistance if he were terminated.  On March 18, 2007, Geib sent Stacharowski an email with "PFG Separation" in the subject line in an attempt to negotiate a severance package.  In the email, Geib also stated "[s]ince entering into PFG-CCF, [he saw] and tried to administer systems and processes through racial and sexual discrimination of employment practices from associates to management and management to associates."  (ECF No. 38-15).  On March 19, 2007, Stacharowski emailed Geib terminating his employment and stating "the decision to terminate [his] employment was not made until [that day]."  (ECF No. 31-23).

On July 16, 2007, Geib filed a formal Charge of Discrimination with the Maryland Commission on Human Relations

and the United States Equal Employment Opportunity Commission ("EEOC"), alleging race- and sex-based discrimination and retaliation. (ECF No. 38-17). On June 20, 2013, Geib received a Notice of Right to Sue from the EEOC. (ECF No. 1-2). On September 13, 2013, Geib initiated this action alleging retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e et seq. (2012). (ECF No. 1). PFG filed an Answer on November 8, 2013. (ECF No. 3). On April, 6, 2015, PFG filed a Motion for Summary Judgment. (ECF No. 28). On May 7, 2015, Geib filed an Opposition to the Motion (ECF No. 38) and Motion to Strike Certain Paragraphs [of] Defendant's Affidavits (ECF No. 39). On May 22, 2016, PFG filed an Opposition to the Motion to Strike (ECF No. 40). On June 16, 2015, PFG subsequently filed a Reply to Geib's Opposition. (ECF No. 43).

## II.   DISCUSSION

### A. Motion to Strike

Geib requests that the Court strike certain statements made in the Declarations PFG uses to support its Motion for Summary Judgment pursuant to the sham affidavit doctrine. Under the sham affidavit doctrine, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's

6

earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." Ervin v. JP Morgan Chase Bank NA, No. GLR-13-2080, 2014 WL 4052895, at *2 (D.Md. Aug. 13, 2014) (quoting Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999)). "Application of the sham affidavit rule at the summary judgment stage 'must be carefully limited to situations involving flat contradictions of material fact.'" Id. (quoting Zimmerman v. Novartis Pharm. Corp., 287 F.R.D. 357, 362 (D.Md. 2012)).

### 1. Russ's Declaration

Geib argues paragraphs 28 through 32 of Russ's Declaration contradict his prior deposition testimony. In the Declaration, Russ states he never had a conversation with Geib about Lawrence being promoted or interested in or interviewed for the trainer/night supervisor position. He also states he only spoke to Geib about Lawrence being a capable employee in January 2007. During his deposition, however, Russ states he had a conversation with Geib, in which Geib stated Lawrence "had aptitude for a potential position as a supervisor." The Court, therefore, finds Russ's statement in paragraph 32 that he never discussed Lawrence being promoted is flatlly contradicts to his prior sworn testimony and will strike it. The remaining paragraphs will not be stricken.

**2. Wismans's Declaration**

Geib argues paragraphs 17 and 18 of Wismans's Declaration contradict his deposition testimony.  In the Declaration, Wismans states he was not able to make a good assessment of Geib as a person, but was able to assess Geib's performance as a manager based on the numbers in reports and his observations of the warehouse operations.  Wismans made similar statements during his deposition.  (See Wismans Dep. 66:14-21, ECF No. 38-8).  The Court will, therefore, deny Geib's Motion as to paragraphs 17 and 18.

Additionally, Geib argues paragraph 10 of Wismans's Declaration contains inadmissible hearsay evidence.  "'Hearsay' means a statement that the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed.R.Evid. 801(c).  According to Federal Rule of Civil Procedure 56(c)(4), a declaration used to support a motion for summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the declarant is competent to testify on the matters stated.  The declaration "must present evidence in substantially the same form as if the [declarant] were testifying in court," Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996), and cannot be based on inadmissible hearsay, Md. Highways

<u>Contractors Ass'n v. Maryland</u>, 933 F.2d 1246, 1251–52 (4th Cir. 1991).

In paragraph 10, Wismans states he saw Geib standing in a corner with a big stick and later heard from people that Geib would pound his stick on the ground and state "Who am I going to fire tonight?" (Wismans Decl. ¶ 10, ECF No. 35). Wismans's testimony regarding the statements he heard from other people constitutes inadmissible hearsay—the statements of the unidentified people are being offered through Wismans for the truth of the matter asserted. The Court cannot consider the inadmissible evidence to support PFG's Motion. As such, the Court will strike the third-party statements in paragraph 10.

### 3. Stacharowski's Declaration

Geib argues paragraph 29 of Stacharowski's Declaration contradicts his prior deposition testimony. In paragraph 29, Stacharowski testifies he sent an email to Geib stating the decision to terminate Geib was made on March 19, 2007. He further testifies that statement was "not exactly correct" and the decision to terminate Geib was made in late February 2007, but the decision to make Geib's termination effective was made on March 19, 2007. (Stacharowski Decl. ¶ 29, ECF No. 34).

In his deposition, Stacharowski states he believes that the decision to terminate Geib was made on March 19, 2007. PFG attempts to explain this contradiction by arguing the record

9

evidence demonstrates PFG decided to terminate Geib prior to March 18, 2007 because Wismans emailed Stacharowski on March 5, 2007 about Geib's lack of commitment and their need to search for Geib's replacement; PFG began the search for Geib's replacement on March 7, 2007; and Geib emailed Stacharowski entitled "PFG Separation" concerning a severance package on March 18, 2007.

Additionally, the record reflects that on March 14, 2007, Stacharowski asked Geib to contact him or Wismans prior to returning to work because they needed to discuss PFG's decision to terminate Geib.  (ECF No. 31-21; <u>see</u> Stacharowski Decl. ¶ 24, ECF No. 34).  Also, on March 16, 2007, Geib called Stacharowski to discuss PFG posting his job online and whether PFG would offer him financial assistance if he were terminated.  Based on the evidence in the record, the Court concludes that paragraph 29, while contradictory to the March 19, 2007 email, is not a flat contradiction of Stacharowski's deposition testimony.  As such, the Court will deny the Motion as to paragraph 29.

**B. <u>Motion for Summary Judgment</u>**

**1. Standard of Review**

Under Rule 56(a), the Court must grant summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  In reviewing a motion for summary judgment,

the Court views the facts in a light most favorable to the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970)).  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247-48.  A "material fact" is one that might affect the outcome of a party's case.  Id. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)).  Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265.

## 2. Analysis

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any

individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Title VII prohibits discrimination against an employee in retaliation for the employee's opposing of an employer's illegal discrimination practices or participating in Title VII enforcement proceedings.  42 U.S.C. § 2000e-3(a).

A plaintiff must establish a retaliation claim under the "burden-shifting" scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973).  See Vicino v. Maryland, 982 F. Supp. 2d 601, 613 (D.Md. 2013) ("Claims of retaliation are governed by the same proof schemes applicable to Title VII discrimination claims, except that proof of retaliation requires but-for causation; the mixed-motive analysis is inapplicable to retaliation claims." (citing EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405–06 (4th Cir. 2005))).

**a. Prima Facie Case**

To support a claim for retaliation, a plaintiff must demonstrate: (1) "that he engaged in a protected activity," (2) "that the employer took an adverse action against him," and (3) "that a causal relationship existed between his protected activity and the employer's adverse action." Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006) (citing Price v. Thompson, 380

F.3d 209, 212 (4th Cir. 2004)).   A plaintiff first bears the
burden of proving a prima facie case of discrimination by a
preponderance of the evidence.   Texas Dep't of Cmty. Affairs v.
Burdine, 450 U.S. 248, 252-53 (1981).   If a plaintiff
successfully presents a prima facie case, the burden shifts to
the employer to provide a legitimate, nondiscriminatory
justification for its action.   Id. at 253 (citing McDonnell
Douglas, 411 U.S. at 802).   Finally, if the employer carries its
burden, the plaintiff must show that the employer's legitimate,
nondiscriminatory reason is merely a pretext for discrimination.
Id. (citing McDonnell Douglas, 411 U.S. at 804).

In a retaliation claim "a protected activity may fall into
two categories, opposition and participation."   EEOC, 424 F.3d
at 406.   Activities that constitute opposition include informal
protests, such as voicing complaints to employers or using an
employer's grievance procedures under Title VII.   DeMasters v.
Carilion Clinic, 796 F.3d 409, 417 (4th Cir. 2015) (quoting
Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th
Cir. 1998)).   The opposition does not have to rise to the level
of formal charges of discrimination.   See Armstrong v. Index
Journal Co., 647 F.2d 441, 448 (4th Cir. 1981).

Additionally, the opposition by a plaintiff does not need
to stand alone and apart from any other criticism of management,
nor does a plaintiff need to utter "the magic words 'Title VII'"

to have engaged in protected activity. Weintraub v. Mental Health Auth. of St. Mary's, Inc., No. DKC 08-2669, 2010 WL 4868095, at *6 (D.Md. 2010). The Supreme Court has defined the scope of a plaintiff's opposition broadly. "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." Crawford v. Metro. Gov't of Nashville & Davidson Cty., 555 U.S. 271, 276 (2009).

Further, "[a] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity." Pascual v. Lowe's Home Ctrs., Inc., 193 F.App'x 229, 233 (4th Cir. 2006) (quoting Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004)). Temporal proximity between the adverse employment action and the employer's knowledge of the protected activity "gives rise to a sufficient inference of causation to satisfy the prima facie requirement." King v. Rumsfeld, 328 F.3d 145, 151 (4th Cir. 2003) (citing Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989)).

There is a genuine dispute regarding whether Geib engaged in protected activity. Geib testifies that he spoke to Russ about Lawrence being a potential candidate for a supervisor

14

position in January 2007 and complained to Stacharowski and Russ about Lawrence not being considered for a promotion because she is a woman in late February 2007.  It is disputed whether these conversation occurred.  It is undisputed, however, that Geib sent an email to Stacharowski on March 18, 2007, stating that "[s]ince entering into PFG-CCF, [he saw] and tried to administer systems and process through racial and <u>sexual discrimination of employment practices</u> from associates to management and management to associates." (ECF No. 31-22) (emphasis added). Given the broad interpretation of "protected activity," the Court finds that the email constitutes an opposition to an unlawful employment practice.

Additionally, there is a genuine dispute regarding whether a causal connection exists between Geib's protected activity and his termination.  PFG asserts the decision to terminate Geib was made in late February 2007, but the decision to make Geib's termination effective was made on March 19, 2007. Stacharowski's March 19, 2007 email, however, states the decision to terminate Geib was made that day.  Because the date of Geib's termination is disputed, the Court will look to the remaining prongs of the McDonnell-Douglas test.

**b. Legitimate, Nondiscriminatory Reason and Pretext**

Assuming a prima facie case can be shown, PFG has proffered evidence of a legitimate non-discriminatory reason for Geib's

discharge—Geib's inability to improve performance within the warehouse,[3] his poor attendance,[4] and PFG's perception that Geib lacked a commitment to his job.  Shifting the burden back to Geib, he must be able to show that PFG's legitimate, nondiscriminatory reason is merely a pretext for discrimination.  "[W]hen an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'"  Hawkins v. PepsiCo, Inc., 203 F.3d

---

[3] Stacharowski testified that Geib was responsible for the performance of the entire warehouse and was expected to work constantly to fix the problems with the warehouse structure, but his performance was lacking in October, November, and December of 2006.  Russ testified that Geib was terminated for his poor performance and attendance.  Wismans testified that Geib was expected to fix the warehouse operations, reduce error rates, reduce damage, improve service to customers, and ensure timely delivery of products to customers.  Wismans further testified that the warehouse's operations remained chaotic because the staff was not following procedure during Geib's tenure.  Lastly, PFG provides documentation regarding the warehouse's "night thruput," which measures the warehouse's productivity during the night shift. (ECF No. 31-5).  The document shows the warehouse underperformed for the majority of Geib's tenure. (Id.; see ECF No. 31-6 (demonstrating that "mispicks" and "not on trucks" increased during Geib's tenure)).

[4] Geib's work schedule required him to work each week from Sunday through Thursday beginning at around 12:00 p.m.  Based on the documents produced by both parties (ECF Nos. 31-10, 38-21, 38-22), Geib was absent from work on November 23, 2006; November 26-30, 2006; December 24, 2006; December 31, 2006; January 1-3, 2007; one day during the week of January 22 to 28, 2007; February 11-15, 2007; February 25, 2007; and March 4-19, 2007 (to care for his children).

274, 279 (4th Cir. 2000) (quoting DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998)).

A court should not second-guess an employer's appraisal. Id. at 280. Rather, the Court's sole concern should be "whether the reason for which the defendant discharged the plaintiff was discriminatory." Id. (quoting DeJarnette, 133 F.3d at 299). The plaintiff "bears the 'ultimate burden of persuading the court that [she] has been the victim of intentional [retaliation].'" Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 252 (4th Cir. 2015) (quoting Hill v. Lockheed Martin Logistics Mgmt., Inc, 354 F.3d 277, 285 (4th Cir. 2004)).

First, Geib argues PFG's reasons for his termination are meritless, but it is not the Court's province to make such an assessment.   Second, Geib argues PFG created reasons to terminate him after his complaints about sex discrimination.

Geib testified that he initially complained to Russ and Stacharowski in late February 2007 when he believed Lawrence was not being considered for a supervisor position because of her gender.  Russ, tasked with supervising CCF from January 2007 to February 4, 2007, emailed Geib several times from January 11, 2007 to February 10, 2007—before Geib's disputed complaints about Lawrence's application—regarding Geib's failure to complete timely reports, properly train and supervise warehouse staff, meet productivity expectations, communicate effectively,

17

and conduct observations of associates.  The Court, therefore, finds that Russ's criticisms of Geib's job performance could not have been made because of Geib's disputed complaints.

Additionally, on February 26, 2007—around the time of Geib's disputed complaints—Russ emailed Mattingly stating that he would make recommendations regarding changes in the warehouse management structure, i.e., replacing Geib.  (Mattingly Decl. ¶ 26, ECF No. 32). Later, after Geib sent his March 3, 2007 email informing Wismans that he would travel to Oklahoma to take care of his children due to his wife's injury, Wismans emailed Stacharowski and Mattingly, stating "I would like a few minutes from both of you today so we can determine a move forward plan with Jason and his lack of commitment and now this," referring to Geib's March 3, 2007 email.  (ECF No. 31-12) (emphasis added).

Lastly, after receiving Geib's "PFG Separation" email seeking a severance package for his perceived termination[5] and

---

[5] It is clear to the Court that Geib believed PFG terminated him before the date of his email.  In the March 18, 2007 email, Geib states PFG's "unethical decision" to post his position online has left him "out in the cold trying to fend for income and benefits to cover his current situation."  (ECF No. 38-15). He further states the only factor leading to his "separation" is his wife's injury.  (Id.).  Geib's requested severance included pay for loss of employment for eight weeks, moving expenses to return his belongings to Oklahoma, and a buy-out of his leased housing.  (Id.).  Lastly, Geib requested a letter that his "dismissal" was due to a medical emergency and he "left [his] job in good standing."  (Id.).

complaining about gender discrimination, Stacharowski emailed
Geib terminating his employment on March 19, 2007. A reasonable
fact-finder could conclude that Geib's termination was based on
Geib's need to take leave to care for his children and
exacerbated by his prior use of three weeks of paid time off
during the first five months of his less than six-month tenure
(see ECF No. 38-22) and his poor job performance. While
terminating an employee because he must leave work to tend to
his family's welfare may not be fair or wise, such a basis is
not discriminatory.[6]

Conversely, Geib presents evidence that he did not perform
poorly as warehouse manager because the warehouse's
underperformance was due to severe understaffing and an increase
in the volume of produce. (Bredberg Dep. at 23, ECF No. 38-6;
Gardner Dep. at 63, 157; ECF No. 38-5). After Geib's disputed
gender discrimination complaints, Wismans instructed
Stacharowski to begin a confidential search for Geib's
replacement and Stacharowski requested that Geib contact him or
Wismans before returning from Oklahoma because they needed to
discuss PFG's decision to terminate him. After Geib's March 18,
2007 email complaining about gender discrimination, Stacharowski

---

[6] The Court will not address whether Geib was entitled to
leave under the Family Medical Leave Act, 29 U.S.C. §§ 2601 et
seq. (2012), and whether his termination can give rise to a
claim for violation of the Act.

informed Geib that PFG decided to terminate him on March 19, 2007.

A reasonable fact-finder could conclude that Russ and Wismans sought to replace Geib because of his late February 2007 gender discrimination complaints and PFG decided to terminate Geib on March 19, 2007 because of the discrimination complaint made in his March 18, 2007 email.  The Court, therefore, concludes that Geib has presented sufficient evidence that PFG's explanation for terminating him was pretextual.  Accordingly, the Court will deny PFG's Motion for Summary Judgment.

### III. CONCLUSION

For the reasons stated above, PFG's Motion for Summary Judgment (ECF No. 28) is DENIED and Geib's Motion to Strike (ECF No. 39) is DENIED in part and GRANTED in part.  A separate Order follows.

Entered this 8th day of August, 2016

                                        /s/
                              _____
                              George L. Russell, III
                              United States District Judge